**TRUST CHEM COMPANY LIMITED, Plaintiff,**

v.

**UNITED STATES, Defendant,**

and

**Nation Ford Chemical Company and Sun Chemical Corporation, Defendant–Intervenors.**

**Slip Op. 12–25.**
**Court No. 10–00214.**

United States Court of International Trade.

Feb. 29, 2012.

Ronald M. Wisla and Lizbeth R. Levinson, Kutak Rock LLP, of Washington, DC, for Plaintiff.

Patryk J. Drescher and Alexander V. Sverdlov, Trial Attorneys, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendant. With them on the brief were Tony West, Assistant Attorney General, Jeanne E. Davidson, Director, Patricia M. McCarthy, Assistant Director. Of counsel on the brief was Whitney M. Rolig, Attorney, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of Washington DC.

Gregory C. Dorris, Pepper Hamilton LLP, of Washington, DC, for Defendant–Intervenors.

## OPINION

POGUE, Chief Judge:

This action returns to court following the remand ordered by *Trust Chem. Co. v.*

United States, — CIT —, 791 F.Supp.2d 1257 (2011) (*"Trust Chem I"*). *Trust Chem I* required that the Department of Commerce ("Commerce" or "the Department") reconsider data it had selected to value the nitric acid used to produce Plaintiff's merchandise.

In Commerce's *Final Results of Redetermination Pursuant to Court Remand,* ECF No. 51(*"Remand Results"*), the Department continues to value nitric acid using the data selected prior to the court's remand order. Plaintiff again challenges Commerce's data selection.

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c)and § 516A(a)(2) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2) (2006).[1]

As explained below, the court concludes that, on the basis of the record here, a reasonable mind could find that Commerce's choice constitutes the best data available. Commerce's *Remand Results* are therefore affirmed.

## BACKGROUND

Facts necessary to the disposition of the Remand Results are the following:[2]

The data at issue comes from the World Trade Atlas ("WTA data").[3] Using this database, in the final results of the fourth administrative review of the antidumping order covering Plaintiff's merchandise imported from the People's Republic of China,[4] Commerce selected, for nitric acid, a

---

1. All subsequent citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S.Code, 2006 edition.

2. Familiarity with the court's prior decision is presumed.

3. WTA data is a secondary electronic source published by Global Trade Information Services, Inc., which reports the *Monthly Statistics of Foreign Trade of India. Volume II: Imports,* which in turn is published by the Directorate General of Commercial Intelligence and Statistics of the Ministry of Com-

merce and Industry, Government of India. *Prelim. Surrogate Value Mem.,* Original Admin. R. Pub. Doc. 34 at 2–3 (referring to *http://www.gtis.com/wta.htm.*); see also Original R. Def.'s Resp. to Pl.'s Rule 56.2 Mot. for J. on the Agency R. 3 n. 2, ECF No. 40 ("Original R. Def.'s Br.").

4. *See Carbazole Violet Pigment 23 from the People's Republic of China,* 75 Fed.Reg. 36,-630 (Dep't Commerce June 28, 2010) (final results of antidumping duty administrative review) (*"Final Results"*) and accompanying

value of $10,474 USD/MT.[5]

Plaintiff sought review of Commerce's choice, arguing that: (A) alternative data it proposed was more specific to, and hence more representative of, the nitric acid used in producing its merchandise, and (B) the WTA data was aberrational or unrepresentative.

In *Trust Chem I*, the court affirmed Commerce's rejection of Plaintiff's specificity claim. Although the record indicated that " 'high' strength 98 percent nitric acid [was] used in the production of Trust Chem's merchandise[,]" *Trust Chem I* at 1262, and that "weak" and "high strength" nitric acid had different values, it did not establish the concentration level of the nitric acid for the values proposed by any party.[6] Consequently, based on the record as it then stood, the court rejected Plain-

tiff's claim that there was only one reasonable choice for the value to be selected for the nitric acid at issue. *Trust Chem I* at 1262–63. However, the court remanded the case for Commerce to more adequately demonstrate that the WTA data it did select was a reasonable, not aberrational, choice, when compared to other record data. *Trust Chem I* at 1268–69 ("Commerce's job is to compare the data on the record and provide an explanation that considers the important aspects of the problem presented." (citation omitted)).[7] The court also invited Commerce to reopen the record to obtain appropriate data for comparison.

> [T]he record as it currently stands does not contain specific pricing data from the POR that is representative of the nitric acid used by the respondent.

---

5. *Issues & Decision Memorandum*, A–570–892, ARP 07–08 (June 21, 2010), Original Admin. R. Pub. Doc. 63 ("*I & D Mem.*")(adopted in *Final Results*, 75 Fed.Reg. at 36,631.). The period of review ("POR") was December 1, 2007 to November 30, 2008. Commerce conducts administrative reviews of antidumping duty orders pursuant to 19 U.S.C. § 1675.

5. Because the goods at issue come from China, Commerce employed its rules and practices for non-market economies ("NMEs") in these proceedings. In administrative proceedings involving goods from an NME, Commerce may approximate the normal value of the goods based on "surrogates" for the value of their "factors of production" ("FOP"). 19 U.S.C. § 1677b(c). Commerce selects surrogate data from "one or more" surrogate market economy countries. 19 U.S.C. § 1677b(c)(1),(4). Here, Commerce selected India as the surrogate country. No party challenges this choice.

Within certain statutory limitations, Commerce, using criteria established by regulation and practice, selects specific surrogate values in each individual administrative proceeding, by choosing the "best available information[.]" 19 U.S.C. § 1677b(c)(1)(B).

6. *See Remand Results* at 10. Unlike the original investigation and the first administrative review, here the record indicated that "the

producer used nitric acid with a concentration level of 98 percent to manufacture [Plaintiff's merchandise]." In the original investigation, Commerce found WTA data suggesting a value of more than $4,000 USD/MT to be aberrational. *See Trust Chem I* at 1267.

7. In *Trust Chem I*, the court also noted that Commerce had failed to discuss the value for nitric acid originally submitted by Defendant–Intervenors ("Petitioners"), even though that value was substantially less than the WTA value Commerce selected. *Trust Chem I* at 1267–68. On remand, Petitioners revised their original submission.

> [P]etitioners contend their originally proposed surrogate value of $839.44 per MT from the Indian Department of Commerce's Export Import Data Bank was flawed because it was based on the only data available to them at that time, which were values from 2007–2008 and quantities from 2008–2009 (Apr–Dec). Petitioners also claim the conversion to U.S. dollars was not done properly. Petitioners argue that when the conversion to U.S. dollars is done properly, the AUV [Average Unit Value] is $10,211 per MT. . . .

*Remand Results* at 6.

Such data could be used for comparison to the WTA data. It will therefore be appropriate, upon remand, for Commerce to re-open the record.

*Trust Chem I* at 1268 n. 28.

On remand, Commerce re-opened the record, but Plaintiff chose not to submit evidence that would demonstrate the relationship between prices and concentration levels for nitric acid. *Remand Results* at 23 ("Trust Chem was free to place information on the record regarding nitric acid prices and concentration levels, but chose not to.").[8]

For its part, Commerce placed historical WTA data on the remand record (December 2003–November 2008) for India and other potential surrogate countries, and issued a letter requesting comments from the parties. This historical data showed a wide variation in the value of nitric acid for imports into the different countries.

> [W]e examine the AUVs computed for each of those countries for the December 2007 through November 2008 POR, which are as follows: $457 per MT (Philippines); $508 per MT (Indonesia); $548 per MT (Peru); $1,556 per MT (Colombia); $3,894 per MT (Thailand); and $10,474 per MT (India) [the latter value being that used in Commerce's original *Final Results* ].

*Remand Results* at 11.

Considering these alternatives, Commerce decided that "the WTA AUV used in the *Final Results* appears to be consistent with the higher price range one would expect for 98 percent nitric acid." Department of Commerce Draft Results of Redetermination Pursuant to Court Remand Carbazole Violet Pigment 23 from the People's Republic of China, Remand Admin. Pub. Doc. 9 at 14 ("*Draft Remand Results*"); *see also Remand Results* at 26 ("For the reasons stated above, the De-

partment has not made any changes to its Draft Remand Results").

Commerce acknowledged that the record did not contain "specific evidence to demonstrate the actual concentration(s) of nitric acid imported into India and the other potential surrogate countries." *Id.* at 13. Commerce reasoned, however, that:

> information on the record indicates the safe storage and transport of higher concentrations of nitric acid, including 98 percent nitric acid, requires different, more stringent methods, leading to increased costs. . . . Petitioners also offer a monthly breakdown of the nitric acid import quantities for India and the other potential surrogate countries during the POR and argue the relatively smaller quantities and unit value of Indian imports are in line with concentrated nitric acid imports packed in Teflon or glass containers. . . . While these monthly data do not specify concentration levels, it is notable that [the other potential surrogate value countries, i.e.,] Peru, the Philippines, and Indonesia, the countries with relatively lower AUVs, imported relatively larger quantities on a monthly basis, whereas India, with its relatively higher AUV, imported comparatively smaller volumes on a monthly basis. Since the record indicates it is more difficult and costly to store and ship higher concentration nitric acid, the data suggest the larger volume of imports into Peru, the Philippines, and Indonesia likely would have consisted of lower concentrations of nitric acid.

*Id.* at 14 (citations omitted).

To corroborate its analysis, Commerce also:

> considered the [U.S.] price list data [submitted by the Petitioners] as a measure of how the concentration level

---

8. Plaintiff does not challenge this finding.

of nitric acid reflects price. [footnote omitted] *See* the Draft Remand Determination at 13 (stating "the per-MT price of 98 percent nitric acid is $10,738 (based on the 30 gallon price quoted in the price list) and $13,907 (based on the 15 gallon price)" and noting that "we have considered {these prices} as a measure of how the concentration level of nitric acid affects price") . . . .

*Remand Results* at 24–25.

In addition, the Department determined that the Indian WTA value for nitric acid was not aberrational as it was stable over the five-year period examined. *Remand Results* at 14.

As noted above, Plaintiff now challenges Commerce's remand determination.

### STANDARD OF REVIEW

■ Under the court's familiar standard of review, the Department must, in its remand redetermination, comply with the terms of the court's remand order. *Jinan Yipin Corp. v. United States,* —— CIT ——, 637 F.Supp.2d 1183, 1185 (2009). In addition, the court shall "hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i); *Koyo Seiko Co. v. United States,* 20 F.3d 1160, 1164 (Fed.Cir. 1994).

### DISCUSSION

Plaintiff presents four objections to Commerce's *Remand Results,* claiming that A) they are not responsive to the remand order; B) they are not supported by substantial evidence; C) they improperly rely on U.S. nitric acid prices; and D) they produce absurd results. Pl.'s Cmts. to Commerce's Redetermination Pursuant to Remand 1–12, Dec. 19, 2011, ECF No. 54 ("Pl.'s Cmts."). The court will consider each objection in turn.

### A. Compliance with the court's order.

■ Plaintiff argues that Commerce failed to comply with the remand order, and a second remand is necessary, because the remand results continue to lack usable surrogate value information that is specific to Trust Chem's supplier's nitric acid. Pl.'s Cmts. at 2.

■ But Plaintiff has only itself to blame for the weaknesses in the record—it was Plaintiff that failed to adequately respond to Commerce's decision to re-open the record. *See QVD Food Co. v. United States,* 658 F.3d 1318, 1324 (Fed.Cir.2011) ("Although Commerce has authority to place documents in the administrative record that it deems relevant, 'the burden of creating an adequate record lies with [interested parties] and not with Commerce.' " (alteration in original) (quoting *Tianjin Mach. Imp. & Exp. Corp. v. United States,* 16 CIT 931, 936, 806 F.Supp. 1008, 1015 (1992))). Commerce is not required to find all conceivable data in order to comply with the law. *Makita Corp. v. United States,* 21 CIT 734, 753, 974 F.Supp. 770, 787 (1997). Def.'s Resp. to Pl.'s Cmts. Regarding the Remand Redetermination 7, ECF No. 58 ("Def.'s Resp."). Having reopened the record, Commerce's responsibility was to choose the best available information from the record. The remand order did not require otherwise. Thus, Plaintiff's objection does not provide a basis to reverse Commerce's choice.

### B. Are the Remand Results supported by substantial evidence?

■ ∎As long as Commerce takes the record evidence into account and provides an adequate explanation of its reasonable determination, it does not fail the substantial evidence standard just because there exists evidence that detracts from Com-

merce's decision. *Cleo Inc. v. United States,* 501 F.3d 1291, 1296 (Fed.Cir.2007) (internal citations omitted). "The specific determination we make is 'whether the evidence and reasonable inferences from the record support'" Commerce's findings. *Daewoo Elecs. Co. v. Int'l Union,* 6 F.3d 1511, 1520 (Fed.Cir.1993) (citing *Matsushita Elec. Indus. Co. v. United States,* 750 F.2d 927, 933 (Fed.Cir.1984)).

■ Here, Commerce conceded both that the record evidence was imperfect and that the record revealed wide variation in potential surrogate values. Nonetheless, Commerce gave a reasonable explanation as to why other surrogate values were not appropriate for this matter and how the surrogate value it selected fit into the historical data scheme. Def.'s Resp. at 13–14. Commerce deduced that because the other potential surrogate countries have lower AUVs than India's, but larger monthly import quantities, the numbers are consistent with India's using higher Court No. 10–00214 Page 11 strength nitric acid like that used to purchase Plaintiff's merchandise,[9] which is more costly to produce, store, and transport. *Remand Results* at 14. Bolstering this claim is data regarding the extra chemical processing, costs and expensive shipping methods involved in producing the higher concentration nitric acid. Pet'rs' Cmts., Remand Admin. R. Pub. Doc. 5 at Attach. B and Ex. 1 ("Pet'rs' Cmts."). Based on this record evidence, Commerce's un-rebutted explanation regarding nitric acid's pricing, storage and transportation costs or requirements is reasonable, and is therefore

supported by substantial evidence. *See Nippon Steel Corp. v. United States,* 458 F.3d 1345, 1351 (Fed.Cir.2006), *citing SSIH Equipment SA v. United States ITC,* 718 F.2d 365, 381 (Fed.Cir.1983).

### C. The *Remand Results* do not improperly rely on U.S. nitric acid prices.

■ Plaintiff next contends that Commerce improperly used the U.S. price quotes submitted by Petitioners as benchmarks, directly contradicting Commerce's initial refusal to use U.S. benchmarks during the administrative review. Pl.'s Cmts. at 9. Plaintiff adds that Commerce is now comparing import statistics with a noncontemporaneous U.S. price list. *Id.* at 10.

Commerce acknowledges that the Petitioners submitted data with U.S. prices not specific to the POR. Nonetheless, Petitioners' publicly-available price list shows that higher strength nitric acid sells for much higher prices than the weaker nitric acid. Pet'rs' Cmts. at Attach. B, Ex. 2. Commerce considered this data for a "measure of how the concentration level of nitric acid affects price[,]" rather than as a benchmark for the price selected. *Remand Results* at 14 n. 9.

Moreover, the record clearly indicates that lower import values with larger import quantities represent lower purity levels and higher values with smaller quantities reflect higher purity levels. *Remand Results* at 13–14, 18; Pet'rs' Rebuttal Cmts., Remand Admin. R. Pub. Doc. 11 at 3. *See Lifestyle Enterprise, Inc. v. United*

---

**9.** Plaintiff challenges as "dubious" Commerce's reliance on "98%" nitric acid pricing, arguing that 98% acid is not comparable to Trust Chem's 96%–98% nitric acid. Commerce responds that Trust Chem's reference to 96%–98% is confusing, because while Trust Chem initially reported use of 96%–98% nitric acid, in all subsequent references Trust Chem refers to 98% nitric acid. *Remand Results* at

23–24. Moreover, Commerce found that, even if Trust Chem's supplier did use 96% nitric acid, the cost differences between that and 98% would still be relatively small compared to the differences between weak and high strength nitric acid. *Id.* at 24; Pet'rs' Letter, Original Admin. R. Pub. Doc. 57 at 1–2.

*States,* —— CIT ——, 768 F.Supp.2d 1286, 1309 (2011) ("Commerce cannot base its analysis on mere speculation, but may draw reasonable inferences from the record.") (citation omitted).

As we explained in *Trust Chem I,* "there is no statutory prohibition on using U.S. or other market economy data to corroborate record evidence." *Trust Chem I* at 1266 (citing *Peer Bearing Co.-Changshan v. United States,* —— CIT ——, 752 F.Supp.2d 1353 at 1372 (2011)).

### D. Exhaustion of Administrative Remedies

 Finally, Plaintiff argues that a nitric acid price of $10,474 USD/MT is "patently absurd" because, in fact, low-strength nitric acid is actually used to produce the subject merchandise. Seeking to supplement the record evidence on this issue, Plaintiff now claims that its supplier diluted the 96–98% strength nitric acid that it purchased to create 38% strength nitric acid that was then used to produce the subject merchandise. Pl.'s Cmts. at 12; *Trust Chem's July 31, 2009 Supp. Resp.,* Original Admin. R. Pub. Doc. 18 at 17, 24, App. S1–29, S1–33. Plaintiff asserts that the only reason a supplier would do this would be to save costs by transporting the small amounts of high strength nitric acid and minimizing water shipping costs. Pl.'s Cmts. at 12–13. Plaintiff thus claims that ultimately the surrogate value used for 96–98% nitric acid must be adjusted to reflect the 38% concentration of nitric acid used to produce the subject merchandise. Pl.'s Cmts. at 13.

Commerce and Petitioners correctly respond that because Plaintiff raises this issue for the first time here, after remand, Plaintiff has failed to exhaust its administrative remedies below. *See* 28 U.S.C. § 2637(d) ("In any civil action not specified in this section, the Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies.").

 It is axiomatic that, to preserve Commerce's authority and judicial efficiency, a party, where appropriate, must present its arguments to the agency before bringing them to this court. *Corus Staal BV v. United States,* 502 F.3d 1370, 1379 (Fed.Cir.2007). Commerce must first have an opportunity to consider the issue and give a reasoned response to it. *Gerber Food (Yunnan) Co. v. United States,* —— CIT ——, 601 F.Supp.2d 1370, 1379 (2009). Because of the length of time this matter has been under consideration, requiring exhaustion is particularly appropriate here.

Plaintiff failed to provide Commerce the opportunity to address this issue. *Clearon Corp. v. United States,* —— CIT ——, 800 F.Supp.2d 1355, 1361–63 (2011) ("Plaintiffs unfortunately did not present these arguments to Commerce when they had the opportunity"). Therefore, we decline to hear Plaintiff's argument on its supplier's shipping methodology. Def.'s Resp. at 22.[10]

### CONCLUSION

Commerce's duty, as emphasized by *Trust Chem I,* is to compare the data on the record and provide an explanation that considers the important aspects of the

---

10. Commerce notes that even if Plaintiff had exhausted its remedies below, this argument must still fail because the higher cost of manufacturing and shipping high strength nitric acid would not offset any savings in transportation of nitric acid with less water. In fact, Plaintiff offers no evidence that weak strength nitric acid could even substitute for high strength nitric acid, in light of the importance of chemical purity to the production process. Def.'s Resp. at 23–24.

problem presented. *SKF USA, Inc. v. United States,* 630 F.3d 1365, 1373–74 (Fed.Cir.2011). As long as Commerce reasonably explains its choice between imperfect alternatives, the court will not reject the agency's determination. *Dorbest Ltd. v. United States,* 30 CIT 1671, 1676, 462 F.Supp.2d 1262, 1269 (2006); *Goldlink Indus. v. United States,* 30 CIT 616, 619, 431 F.Supp.2d 1323, 1327 (2006) (The court evaluates "whether a reasonable mind could conclude that Commerce chose the best available information.").

Here Commerce complied with the court's remand instructions and gave a reasonable explanation that due to produc-

tion and transportation costs and different pricing schemes for different concentrations of nitric acid, using the WTA data was appropriate on this administrative record. While it is more than unfortunate that the parties did not create a better record on the main issue presented, our review is based on this record.[11]

Therefore, for the reasons discussed above, Commerce's *Remand Results* will be AFFIRMED. Judgment will be entered accordingly. IT IS **SO ORDERED.**

---

11. "The court shall hold unlawful any determination, finding, or conclusion found—... to be unsupported by substantial evidence on the record, or otherwise not in accordance with law[.]" 19 U.S.C. § 1516a(b)(1)(B)(i).